No. 14325

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

_____

JOSEPH LeROY GARRETT, et al.,

Plaintiff and Respondent,

-vs-

LESLIE F. JACKSON et al.,

Defendants and Appellants.

_____

Appeal from: District Court of the Fifth Judicial District,
Honorable James Freebourn, Judge presiding.

Counsel of Record:

For Appellants:

Schulz, Davis and Warren, Dillon, Montana
John Warren argued, Dillon, Montana

For Respondent:

R. Thomas Garrison argued, Virginia City, Montana

_____

Submitted: September 24, 1979

Decided: OCT - 9 1979

Filed: OCT - 9 1979

_Thomas J. Kearney_
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This appeal is brought by Leslie and Betty Jackson from a decree of the District Court, Fifth Judicial District, declaring Joseph Garrett the owner of a prescriptive easement of way over their land in Madison County, Montana. The sole issue on appeal is whether the evidence presented to the District Court supports its finding that Garrett's use was adverse to the titles of Jacksons and their predecessors in interest and was not merely permissive.

In 1895 Joseph and Sam Heggenberger built a slaughterhouse on a tract of land immediately north of Mill Creek. They sold the tract in 1917 to Walter Ellinghouse, who operated the slaughterhouse until 1946 when Garrett and his wife purchased the land. Garrett continued the slaughterhouse operations until 1962 and remains the owner of the tract. Garrett's land, referred to as the "slaughterhouse tract," is separated from the county road by a strip of land known as the "frontage tract." When Garrett purchased the slaughterhouse tract in 1946, the frontage tract was owned by William Daniels. Daniels' successors in interest are Glen Marsh, who owned the tract until 1971, and the present owners, the Jacksons.

Since the slaughterhouse operations began in 1895, the owners of the slaughterhouse tract have gained access to their land by crossing the frontage tract from the county road. A wooden bridge spanned Mill Creek permitting vehicular traffic onto the slaughterhouse tract until about 1968 when it was weakened by flooding.

Until 1958 the frontage tract was unenclosed, but in that year Marsh began raising sheep and constructed a wire fence around the tract to hold them on his land. When he

-2-

built the fence, Marsh did not leave a gateway along the county road. Consequently, when Garrett attempted to get onto his tract he was confronted by a solid fence. Garrett selected a point on the fence about 100 feet east of the route which he had previously followed, cut the wires of the fence, and proceeded through. He twisted the wires together behind him to keep the sheep from escaping, and later notified Marsh of what he had done. Marsh was upset over Garrett's action, but later agreed to place a "drop wire" gate in the fence at the point where Garrett had clipped the wires. Marsh offered to place a gate at the point where Garrett had previously entered the frontage tract, but never constructed such an entryway. Garrett continued to use the new route across for the next 12 years until 1971, even though the regular slaughterhouse business ceased in the early 1960's.

There was evidence that when the Jacksons purchased the frontage tract in 1971 Garrett requested a written easement, which they refused. However, Garrett continued to use the gate built by Marsh, driving as far as Mill Creek, and crossing the creek on foot onto his land. He also cleared brush along the roadway with a chainsaw to keep it open.

In 1971 Jacksons constructed a "jack fence" across the road about midway across their tract. Garrett did not cut through this fence, but parked his vehicle by it and proceeded on foot onto his land. In 1976 the Jacksons wired shut the gate which Garrett had used since 1958. Garrett clipped the wires and removed poles which Jacksons had placed over it. The Jacksons then chained and padlocked the gate, preventing Garrett from entering, and sent a letter to Garrett accusing him of being a trespasser. Thereafter,

Garrett brought this action. During the last two years before the gate was chained and locked, Garrett had used the route across Jacksons' land some twenty to thirty times per year.

It is clear from the evidence presented to the District Court that plaintiff Garrett and his predecessors in interest have used defendant Jacksons' land for many years as a means of access to the slaughterhouse tract. However, because Garrett changed the route in 1958, whatever claim he now has to a prescriptive easement must be shown to have accrued since that date and with respect to the new route.

To establish a prescriptive easement, the owner of the purported dominant tenement must establish open, notorious, exclusive, adverse, continuous, and unmolested use of the servient tenement for the full statutory period of five years required to acquire title by adverse possession. The claimant, however, is entitled to rely upon a presumption that his use was adverse to the servient owner's title if he demonstrates by his evidence the other elements of his claim. Luoma v. Donohoe (1978), ___ Mont. ____, 588 P.2d 523, 525, 35 St.Rep. 1971, 1973-74; Staudinger v. DeVries (1978), ____ Mont. ___, 581 P.2d 1, 2, 35 St.Rep. 861, 863; Mountain View Cemetery v. Granger (1978), ___ Mont. ____, 574 P.2d 254, 257, 35 St.Rep. 76, 79.

Thus, when the dominant owner makes this preliminary showing of open, notorious, continuous, and unmolested use for the statutory period, the burden falls upon the owner of the servient tenement to show that the use was not adverse, but merely permissive. Luoma, 588 P.2d at 525, 35 St.Rep. at 1974; Mountain View Cemetery, 574 P.2d at 254, 35 St.Rep. at 79; O'Connor v. Brodie (1969), 153 Mont. 129, 137, 454

P.2d 920, 925. The Jacksons argue that Garrett's act of cutting the fence wires in 1958 was not hostile or adverse because Garrett rewired the fence after he had gone through it. However, Garrett's action is readily explained by the presence of livestock on the frontage tract at the time. His concern for Marsh's sheep is in no way inconsistent with his claim of right-of-way. The District Court found specifically that after Marsh installed the drop wire gate Garrett would close the gate behind him if livestock were present, and leave it open if there were none. In at least one other instance, this Court has described gate-cutting as a "distinct and positive assertion of a hostile right to the rights of the owner . . ." Taylor v. Petranek (1977), ___ Mont. ____, 568 P.2d 120, 123, 34 St.Rep. 905, 910. In this case, where Garrett cut the fence without seeking permission, and only later informed the servient owner of his act, the District Court was well justified in concluding that Garrett's use was adverse and hostile to Marsh's title.

The Jacksons' second attempt to overcome the presumption that Garrett's use was adverse is their assertion that the presence of a gate through which Garrett could later pass is strong evidence of permissive use. However, this Court has ruled that the presence of a gate alone "will not defeat a prescriptive easement." Hayden v. Snowden (1978), ____ Mont. ____, 576 P.2d 1115, 1118, 35 St.Rep. 367, 371. As was said in Kostbade v. Metier (1967), 150 Mont. 139, 145, 432 P.2d 382, 386, "[t]he evidence of this one gate, admittedly built not to stop people but cattle, is not enough standing alone to rebut the presumption [that the use was adverse]."

In the present matter, Marsh constructed a very simple gate at the point where Garrett cut through the fence, for the apparent purpose of providing a convenient method of holding his sheep in after Garrett passed through. Thus, the District Court's judgment that Garrett's use of the roadway from 1958 to 1971 was adverse to Marsh's title is supported by substantial credible evidence and by the presumption of adversity. There is no clear preponderance of the evidence against the District Court's conclusion.

The Jacksons testified at trial that they were unaware of any claim to an easement across their property until some time after they purchased the land, and that even then, Garrett's use was not adverse. However, assuming that the District Court correctly concluded that Garrett's claim fully ripened from 1958 to 1971, it is not necessary for Garrett to again establish his claim after the transfer of the servient tenement. In O'Connor v. Brodie, supra, 153 Mont. at 139, 454 P.2d at 926, this Court held that once the owners of a water line easement had acquired their prescriptive title, the servient owner's knowledge or lack of knowledge of the claim was immaterial:

> "But whether the defendants had actual knowledge
> of the underground water line is immaterial for
> the reason that plaintiffs had acquired prescrip-
> tive title prior to the time defendants acquired
> their property. Prescriptive title once estab-
> lised is not divested by the subsequent transfer
> of the servient estate. Ferguson v. Standley,
> 89 Mont. 489, 498, 300 P.2d 245, [249]."

See also Mountain View Cemetery v. Granger, supra, 574 P.2d at 258, 35 St.Rep. at 81.

Garrett's use of the existing roadway from 1958 is sufficient to create a presumption of adverse use. The Jacksons failed to overcome that presumption, and the

-6-

District Court's judgment that Garrett has prescriptively acquired an easement across the land is supported by sufficient, substantial credible evidence.

The judgment of the District Court is affirmed.

_Gene B Daly_
Justice

We concur:

_Frank J. Haswell_
Chief Justice

_John Conway Harrison_

_Daniel J. Shea_

_John C. Sheehy_
Justices